858 F.2d 289
 47 Fair Empl.Prac.Cas. 1701,
47 Empl. Prac. Dec. P 38,288, 57 USLW 2263
 Carl W. STOTTS, individually and on behalf of all others
similarly situated, Fred L. Jones, Plaintiffs-Appellees,
v.
MEMPHIS FIRE DEPARTMENT, Robert W. Walker; City of Memphis;
and Joseph Sabatini, Defendants-Appellants.
 No. 86-5511.
 United States Court of Appeals, Sixth Circuit.
 Argued Aug. 4, 1987.
Decided Sept. 23, 1988.
Rehearing and Rehearing En Banc Denied Dec. 6, 1988.
 
 Louis P. Britt, III (argued), Clifford D. Pierce, Jr., Charles V. Holmes, Memphis, Tenn., for defendants-appellants.
 Richard B. Fields (argued), Cox and Fields, Memphis, Tenn., for plaintiffs-appellees.
 Before MERRITT and RYAN, Circuit Judges; and CONTIE, Senior Circuit Judge.
 RYAN, Circuit Judge.
 
 
 1
 Defendant Memphis Fire Department appeals from the issuance of a permanent injunction reinstating Jesse Jones, Jr. to the rank of captain and enjoining the Department from demoting Jones for his involvement in a November 21, 1983, fight with former lieutenant Tom Boillot. Following the fight, the Department demoted both Jones, who is black, and Boillot, who is white, to the rank of private. Jones thereafter filed suit under the terms of a 1980 consent decree issued in a separate class action brought against the Department by a class of its black employees. Jones' claim is that he has been disparately disciplined because of his race in being demoted two ranks, from captain to private, while Lieutenant Boillot was only demoted one.
 
 
 2
 Under the terms of the 1980 consent decree, the district court's jurisdiction over Jones' claim is dependent upon a showing that the discipline given Jones is departmental "conduct which constitutes a pattern or practice of unlawful discrimination on the basis of race." See Stotts v. Memphis Fire Dep't, 679 F.2d 541, 574-75 (6th Cir.1982), rev'd, 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984). The district court held that it had jurisdiction over the case because Jones had established a Departmental "pattern or practice" of administering disparate discipline on the basis of race. The court further held that Jones had been disparately disciplined because of his race and ordered him reinstated to the rank of captain.
 
 
 3
 We hold that the district court lacked jurisdiction because the court's factual finding that the Department engaged in a pattern of practice of administering disparate discipline on the basis of race is clearly erroneous. We therefore reverse the court's order and dismiss Jones' claim.
 
 I.
 
 4
 The consent decree which is the basis for the district court's jurisdiction in this case originated out of a 1977 class action filed against the Department by Carl Stotts, a Memphis firefighter. Stotts alleged that the Department's hiring and promotion policies were racially discriminatory and violative of Title VII, 42 U.S.C. Sec. 2000e et seq., 42 U.S.C. Sec. 1981 and 42 U.S.C. Sec. 1983. Stotts' case was later consolidated with an action brought by Fred Jones, another Memphis firefighter. Fred Jones also claimed that he was denied a promotion solely because of his race. Jesse Jones, Jr., the plaintiff in this case, was a private at the time the Stotts case was filed. He was also the leader of the Pioneers, a group of about seventy black Memphis firefighters who unsuccessfully moved to intervene in the Stotts case.
 
 
 5
 In 1980, after three years of discovery and intensive negotiations, but prior to trial, the parties settled the Stotts suit by agreeing to a consent decree. The consent decree, set out at Stotts v. Memphis Fire Dep't, 679 F.2d at 573-79, provides that the Department admits no violation of any law, rule, or regulation, but that:
 
 
 6
 Defendants [the Memphis Fire Department] are compelled by law and by entering into this Consent Decree acknowledge their obligation to, and agree that they shall, refrain from engaging in any act or practice which has the purpose or effect of unlawfully discriminating against any employee of, or any applicant or potential applicant for employment with, the Memphis Fire Department because of such individual's race or color. Defendants in addition acknowledge their duty under law to and agree that they shall, refrain from discrimination at any time on the basis of race in hiring, promotion, upgrading, training, assignment or discharge or otherwise discriminating against an individual employee or applicant for employment with respect to compensation, terms and conditions or privileges of employment because of such individual's race. The City shall take reasonable steps to assure that no member of the Fire Department interferes with the enforcement of this decree by any means. The acknowledgements set forth in this paragraph do not create a right or rights in any person or groups of persons to seek relief under this Decree for defendants' failure to comply with their general legal obligations as described in this paragraph, except for conduct which constitutes a pattern or practice of unlawful discrimination on the basis of race.
 
 
 7
 Id. at 574-75 (emphasis added).
 
 
 8
 On December 2, 1983, following his demotion from captain to private, Jesse Jones applied to the district court for a temporary restraining order and an order to show cause why a preliminary injunction should not issue. Under the terms of the 1980 decree, the court had to determine initially whether Jones had established a "pattern or practice" sufficient to invoke the court's jurisdiction. Stotts v. Memphis Fire Dep't, 774 F.2d 1164 (6th Cir.1985) (per curiam). On December 19, in a ruling from the bench, the court ordered Jones reinstated, finding "a pattern and practice of the City to not recognize properly the Black fireman." On appeal, this court vacated the judgment of the district court under Fed.R.Civ.P. 52(a) because the court failed to "make findings which are sufficient to indicate the factual basis for its ultimate conclusion...." Id. (quoting Squirt Co v. Seven-Up Co., 628 F.2d 1086, 1092 (8th Cir.1980)).
 
 
 9
 On remand, the court held additional evidentiary hearings which were consolidated with the court's December 1983 hearings for the purposes of resolving Jones' claims for both preliminary and permanent injunctive relief and for a ruling on the merits pursuant to Fed.R.Civ.P. 65. The court reaffirmed its original conclusion that Jones had demonstrated a pattern or practice within the Department of disparately disciplining firefighters based on their race. The court also concluded that Jones had personally been disparately disciplined because of his race, ordered that the Department reinstate Jones to captain, and permanently enjoined the Department from further disciplining Jones for his involvement in his November 1983 fight with Lieutenant Boillot. This appeal followed.
 
 II.
 
 10
 On January 11, 1979, the Memphis Fire Department adopted a "Manual of Rules and Regulations" to serve in part as the official written code for firefighter conduct and disciplinary procedure. Under the Manual, the level of discipline handed down in any particular case should be determined in part by the employee's personnel history and the seriousness of the underlying offense. According to James R. Smith, a former Director of Fire Services, discipline under the Manual should be corrective in nature and progressive. According to the Manual:
 
 
 11
 Supervisors should be aware of the degree of disciplinary action which is fair in regard to the offense. The degree of discipline should increase with each subsequent sustained action which is similar in nature. The supervisor should consider the following factors:
 
 
 12
 1) Seriousness of the violation.
 
 
 13
 2) Mitigating circumstances, if any.
 
 
 14
 3) Length of service and previous record of the employee.
 
 
 15
 4) Reasonable consistency in applying similar penalties to similar offenses.
 
 
 16
 5) The prospect that disciplinary action may play a rehabilitative role.
 
 
 17
 6) Attitude and conduct of the employee throughout investigation and personal interview.
 
 
 18
 Ordinarily discipline may be applied in a progressive fashion with more severe penalties following successive violations. This is particularly true when relatively minor offenses occur. However, the most significant consideration is for the penalty to be in proportion to the violation. Serious offenses may call for appropriately serious penalties.
 
 
 19
 ....
 
 
 20
 The discipline processes should follow progressive steps as defined in the Memorandum of Understanding. This does not mean that supervisors are limited to a reprimand as an initial step. Fairness and reason should be employed to insure that the action taken is properly suited to the offense committed.
 
 
 21
 Section 3.802 of the Manual outlines the progressive forms of discipline ordinarily imposed for violations of prescribed firefighter conduct:
 
 
 22
 Disciplinary action shall be corrective in nature and shall involve the following progressive measures, except that major violations may proceed to more severe actions which could include termination:
 
 
 23
 (a) Oral reprimand
 
 
 24
 (b) Written reprimand
 
 
 25
 (c) Suspension, documented in writing
 
 
 26
 (d) Termination
 
 
 27
 An oral reprimand remains in an employee's file for six months and is removed if no further incident occurs. Similarly, a written reprimand remains on file for twelve months. A suspension, however, remains in the employee's file for as long as he remains in the Department's employ.
 
 
 28
 In cases involving "major" violations, the Department is empowered to bypass the progressive sequence of discipline outlined in Section 3.802 and may immediately suspend or terminate the employee. Section 3.803 states that "[m]ajor violations include, but [are] not ... limited to:"
 
 
 29
 (a) Insubordination
 
 
 30
 (b) Refusal to obey an order
 
 
 31
 (c) Threats of violence
 
 
 32
 (d) Fighting
 
 
 33
 (e) Possession of firearms and/or weapons
 
 
 34
 (f) Stealing
 
 
 35
 (g) Disruption of work
 
 
 36
 (h) Neglect of duty
 
 
 37
 (i) Destruction of property
 
 
 38
 (j) Use or possession of illegal drugs or narcotics including marijuana
 
 
 39
 (k) Intoxication
 
 
 40
 (l) Making false statements
 
 
 41
 (m) Misrepresentations on Divisional reports
 
 
 42
 (n) Failure to give true statements at Administrative investigations
 
 
 43
 (o) Unauthorized leave
 
 
 44
 (p) Refusal to work in emergency situations or when the needs of the Division require
 
 
 45
 (q) Repeated violations
 
 
 46
 (r) Violation the employee is still involved in progressive disciplinary action of the same nature of offense.
 
 
 47
 The violation for which plaintiff Jones was allegedly disparately disciplined was a "major" violation within the meaning of Section 3.803(d) of the Department's manual. The only witnesses to the start of the fight were Jones and Boillot themselves. Each firefighter claimed that the other initiated the fight which apparently resulted from a heated conversation concerning Captain Jones' handling of the key to the engine house's food locker. Both men agreed that the fight was not racially motivated.
 
 
 48
 Four firefighters testified that when they attempted to separate the combatants, they found Captain Jones sitting or kneeling on top of Boillot and striking him about the head. At trial, Jones admitted that he struck Boillot "two, three, maybe four times." After being pulled apart, each man continued to threaten, curse, and taunt the other to resume the fight. As a result of the fight, Boillot suffered a broken nose and Jones suffered minor abrasions.
 
 
 49
 Two days after the fight, on November 23, 1983, the Department convened a three-member administrative panel to investigate the incident and to recommend appropriate disciplinary action. In accord with the Manual's directives, the panel considered both Jones' and Boillot's length of service and previous records. Boillot had fifteen years of service within the Department as a private, a driver, and a lieutenant.[1] During his service, on September 1, 1983, Boillot received a written reprimand for "over-reacting" in disciplining a lower-ranking firefighter. The district court also noted that Boillot had been suspended for disobeying a direct order and had admitted himself to the City's 004 Program for Alcohol Abuse. However, neither of these incidents is relevant to a determination of whether the panel disparately disciplined Captain Jones in November of 1983 for his involvement in the November 21, 1983 fight with Boillot.[2]
 
 
 50
 Captain Jones joined the Department as a private in 1971. His personnel record indicated that he was disciplined on three separate occasions as a private. In early 1975, Jones received a written reprimand for fighting.[3] In July of 1975, Jones was suspended for sixteen hours, again for fighting. The suspension was later reduced to eight hours. Finally, in 1977, Jones was dismissed for fighting and admonished that "[p]hysical violence among employees on duty must not and will not be tolerated." The Civil Service Commission subsequently overturned Jones' dismissal and ordered him reinstated with a one-month suspension and six-month probationary period.
 
 
 51
 After reviewing the testimony of the parties and witnesses as well as the parties' personnel records, the panel recommended to Director J.R. Smith that Jones and Boillot be dismissed from the Department. Smith rejected the panel's recommendation in part because he did not think the Civil Service Commission would uphold the determination since there were no independent witnesses to the fight. The panel then recommended that both men be demoted to the rank of private II because, in the words of District Chief Bryant, "[W]e didn't feel that either one of them should be in an officer's rank." Smith accepted the panel's second recommendation, and demoted Jones and Boillot to private II in order to take them "out of a supervisory capacity."
 
 
 52
 Jones now claims that he was disparately disciplined because of his race in that he was demoted from captain to private II, seemingly a demotion of three full ranks, while Boillot was demoted from lieutenant to private II, seemingly a demotion of only two full ranks.
 
 III.
 
 53
 As we have indicated, in order to invoke the district court's jurisdiction, Jones must show that his demotion was part of a pattern or practice of unlawful disparate treatment based on race. Stotts v. Memphis Fire Dep't, 774 F.2d 1164 (6th Cir.1985). The district court held that Jones successfully carried his burden of demonstrating the decree's jurisdictional prerequisite. We disagree and conclude that Jones has failed to show that similarly situated black firefighters received disparate discipline for offenses of comparable seriousness because of their race.
 
 
 54
 In a disparate treatment case, it is the plaintiff's burden to prove that an employer intentionally "treats some people less favorably than others because of their race, color, religion, sex, or national origin." International Brotherhood of Teamsters v. United States, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977).
 
 
 55
 The defendant need not carry the burden of persuasion as to the nonexistence of a disparity; on the disparate treatment claim "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff...."
 
 
 56
 Segar v. Smith, 738 F.2d 1249, 1268 (D.C.Cir.1984), cert. denied, 471 U.S. 1115, 105 S.Ct. 2357, 86 L.Ed.2d 258 (1985) (quoting Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981)).
 
 
 57
 In a case such as this, where it is alleged and required to be shown that the defendant routinely disciplined blacks more severely than whites for comparable violations of the canons of firefighter conduct, "[t]he ultimate factual issues are ... simply whether there was a pattern or practice of such disparate treatment and, if so, whether the differences were 'racially premised.' " Teamsters, 431 U.S. at 335, 97 S.Ct. at 1854 (quoting McDonnell Douglas Corp. v. Green, 411 U.S. 792, 805 n. 18, 93 S.Ct. 1817, 1825 n. 18, 36 L.Ed.2d 668 (1973)). "Proof of illicit motive is essential, but, especially in cases alleging class-wide discrimination, illicit motive may be inferred from a sufficient showing of disparity between members of the plaintiff class and comparable qualified members of the majority group." Segar v. Smith, 738 F.2d at 1265-66 (citing Teamsters, 431 U.S. at 335 n. 15, 97 S.Ct. at 1854 n. 15). The plaintiff's case must, however, eliminate "the most common nondiscriminatory reasons for the plaintiff's rejection." Burdine, 450 U.S. at 253-54, 101 S.Ct. at 1094 (citing Teamsters, 431 U.S. 324, 358, and n. 44, 97 S.Ct. 1843, 1866, and n. 44). The plaintiff may find it particularly difficult to eliminate "the most common nondiscriminatory reasons" in the context of an allegedly discriminatory disciplinary decision as opposed to an allegedly discriminatory hiring decision. In the disciplinary context, the plaintiff must also eliminate the two added variables which form the "most likely sources of different but nondiscriminatory treatment[:] the nature of the offenses committed and the nature of the punishments imposed." Moore v. City of Charlotte, 754 F.2d 1100, 1105 (4th Cir.), cert. denied, 472 U.S. 1021, 105 S.Ct. 3489, 87 L.Ed.2d 623 (1985).
 
 
 58
 The plaintiff who alleges a discriminatory pattern or practice, be it through disciplinary measures or hiring procedures, must ultimately prove
 
 
 59
 more than a mere occurrence of isolated or "accidental" or sporadic discriminatory acts. [He must] establish by a preponderance of the evidence that racial discrimination was the Company's standard operating procedure--the regular rather than the unusual practice.
 
 
 60
 Teamsters, 431 U.S. at 336, 97 S.Ct. at 1855 (footnote omitted). As Title VII's legislative history points out:
 
 
 61
 [A] pattern or practice would be present only where the denial of rights consists of something more than an isolated, sporadic incident, but is repeated, routine, or of a generalized nature.
 
 
 62
 ....
 
 
 63
 The point is that single, insignificant, isolated acts of discrimination by a single business would not justify a finding of a pattern or practice....
 
 
 64
 Id. at 336 n. 16, 97 S.Ct. at 1855 n. 16 (quoting 110 Cong. Rec. 14270 (1964) (remarks of Sen. Humphrey) (referring to Sec. 707(a) of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e-6(a))).
 
 
 65
 A district court's finding of discriminatory intent in a pattern and practice case is a factual finding that may be overturned on appeal only if clearly erroneous. Anderson v. City of Bessemer City, 470 U.S. 564, 566, 105 S.Ct. 1504, 1508, 84 L.Ed.2d 518 (1985) (citing Pullman-Standard v. Swint, 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982)). While, as an appellate court, we "must constantly have in mind that [our] function is not to decide factual issues de novo," id., 470 U.S. at 573, 105 S.Ct. at 1511 (quoting Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969)), we must nonetheless overturn a district court's finding as clearly erroneous "when although there is evidence to support it, ... on the entire record [we are] left with the definite and firm conviction that a mistake has been committed." Id. (quoting United States v. United States Gypsum, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)).
 
 
 66
 With these principles in mind, we now examine the district court's finding that the Memphis Fire Department intentionally engaged in a pattern and practice to discipline black firefighters more severely than their white counterparts.
 
 IV.
 
 67
 The district court focused on four primary categories of Departmental activity in finding a disparate pattern and practice in the discipline handed down by the Department to its black firefighters and their similarly situated white counterparts: (1) fight-related discipline; (2) discipline for other major violations; (3) discipline for miscellaneous minor violations; and (4) nondiscipline related acts. We now analyze, separately, the court's findings with respect to each category.
 
 A.
 Fight-Related Discipline
 
 68
 In the five and one-half years following the entry of the parties' 1980 consent decree (from May 15, 1980 to December 4, 1985), the Department issued discipline for only four separate fighting incidents, including the incident involving Jones and Boillot.[4] The district court summarily held that "[i]n each [of the four] incident[s], if a black participated he initially received more severe discipline than the white at the hands of the Department." While facially accurate, the court's statement simply ignores several significant nonracial factors which are relevant to explain the Department's apparently inconsistent fight-related discipline. These factors show that in accordance with policies outlined in its Manual, the Department imposed discipline which was both progressive and proportionate to the seriousness of the underlying violation. Indeed,
 
 
 69
 [t]he most important variables in the disciplinary context, and the most likely sources of different but nondiscriminatory treatment, are the nature of the offenses committed and the nature of the punishments imposed.
 
 
 70
 Moore, 754 F.2d at 1105 (emphasis added).
 
 
 71
 In McDonald v. Santa Fe Trail Transportation Co., 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976), the Court emphasized the importance of analyzing comparable employment decisions in cases involving claims of discrimination:
 
 
 72
 [P]recise equivalence in culpability between employees is not the ultimate question: as we indicated in McDonnell Douglas, an allegation that other "employees involved in acts against [the employer] of comparable seriousness ... were nevertheless retained ..." is adequate to plead an inferential case that the employer's reliance on his discharged employee's misconduct as grounds for terminating him was merely a pretext.
 
 
 73
 Id. at 283 n. 11, 96 S.Ct. at 2580 n. 11 (quoting McDonnell Douglas, 411 U.S. at 804, 93 S.Ct. at 1825 (emphasis retained)). "This mandate sets for lower federal courts the difficult, but not unfamiliar task of assessing the gravity of offenses on a relative scale." Moore, 754 F.2d at 1107. However, factual findings which "rest on ... unprincipled conception[s] of 'similarity' and 'comparability,' " are structurally flawed and render the fact-finding process clearly erroneous. Id. at 1106 (citing Miller v. Mercy Hospital, 720 F.2d 356, 361 (4th Cir.1983), cert. denied, 470 U.S. 1083, 105 S.Ct. 1841, 85 L.Ed.2d 141 (1985)).
 
 
 74
 The district court's analysis of the four instances of fight-related discipline imposed by the Memphis Fire Department in this case failed to fully account for the relative seriousness of the underlying violations and the personnel records of the firefighters involved. As a result, instances which were not of "comparable seriousness" were analyzed as though they were. We agree with the Fourth Circuit that such an analysis is inherently flawed and, as a result, clearly erroneous. Id. at 1106-10.
 
 
 75
 * The first fighting incident considered by the district court is of virtually no significance in establishing a pattern and practice of disparate discipline. In August of 1980, Private George Thomas, who is white, received a written reprimand for fighting. The facts surrounding the fight, including the relative seriousness of the incident, the punishment given to Thomas' combatant, and Thomas' personnel history, were not developed at trial or considered by the court. The court simply relied upon the fact that Thomas received a lesser punishment for fighting than did plaintiff Jones.
 
 2
 
 76
 The second incident relied upon by the court involved Private William Murphy, white, and Private Boyd Malone, black. In November of 1981, Murphy and Malone were suspended for their involvement in an engine house altercation. Murphy received a forty-hour suspension and Malone initially received a sixty-four hour suspension. Malone appealed the suspension and it was eventually reduced to forty hours by Director Smith. The district court found that the disparate periods of suspension as originally imposed were evidence of a departmental racial animus against blacks. However, a more detailed examination of the nature of each firefighter's participation in the fight suggests otherwise.
 
 
 77
 Malone's original letter of suspension states that "during the altercation you [Malone] did admittedly pull a knife on Private Murphy, and at some point the other employee did, in fact, receive a minor cut to his finger." The Department's Manual specifically states that "the most significant consideration [in disciplining a firefighter] is for the penalty to be in proportion to the violation." See section II, supra. While the Manual simply provides that "fighting" is a major violation, it is manifest that a firefighter who is armed with a knife in a fight with a combatant who is unarmed poses a more serious threat than his unarmed adversary.
 
 3
 
 78
 The third fighting incident the district court considered was a May 1983 disciplinary action in which Private Jerry Bennett, white, was suspended for ninety-six hours for his participation in a fight with Private Donald Murray, black, who was discharged. The court held that Bennett and Murray were disparately disciplined given that neither had been previously disciplined. However, in October of 1981, Murray, at the Department's suggestion, had undergone a medical examination after making death threats to his fellow firefighters. Dr. David Knott opined that Murray had a "personality disorder-paranoid type," and concluded "that there should be a behavior contact between the employer and the employee which delineates specific acceptable vocational behavior." Murray was thereafter advised that "the Fire Department would not tolerate any more behavior of the [same] type and that if it happened again, [he] would be terminated." Murray also did not follow through with Dr. Knott's prescribed outpatient treatment.
 
 
 79
 The Department notified Murray on June 2, 1983, that his employment was being terminated based upon "a hearing and investigation into an incident in which you were fighting with a fellow employee, combined with the fact that you had been previously warned and counseled about just such type of conduct...." The notice continued:
 
 
 80
 From the testimony given at the investigation and from the written statements it has been determined that you were indeed involved in a fight with Private Jerry Bennett on May 25, 1983, which in and of itself is grounds for disciplinary action. Yet, it is not the sole basis of your termination....
 
 
 81
 From the witnesses, it was learned that you picked up two drink bottles and started toward Private Bennett sometime after the original fight between you and Private Bennett.... [Y]ou had to be physically restrained from attacking Private Bennett and the bottles had to be forcibly removed from your possession, after which you continued to make threatening remarks.... (Emphasis added.)
 
 
 82
 According to the Department's manual, "[t]he degree of discipline should increase with each subsequent sustained action which is similar in nature." See section II, supra. Further, the "previous record of the employee" is relevant to a determination of the appropriate level of discipline. Id.
 
 
 83
 Upon a close analysis of the circumstances underlying the Department's decision to suspend Private Bennett and to terminate Private Murray, it is clear that race was not a factor. Nor can Murray's termination and Malone's suspension be meaningfully compared to Thomas' reprimand or the suspensions of Murphy and Bennett given the differences in the nature of each incident, the conduct of each combatant, and their disparate personnel histories. Under the Department's manual, "[t]he most significant consideration is for the penalty to be in proportion to the violation." Under the facts of this case, of the three fighting incidents analyzed, not including the Jones-Boillot fight, no two violations or violators are comparable. This is particularly true because one combatant was armed and another was a repeat offender who had previously been warned about the serious consequences of his conduct. We stress, however, that "precise equivalence in culpability between employees is not the ultimate question...." McDonald v. Santa Fe Trail Transportation Co., 427 U.S. at 283 n. 11, 96 S.Ct. at 2580 n. 11, 49 L.Ed.2d 493. What is essential to proof of "pattern and practice" is a showing that the other "employees involved in acts against [the employer] of comparable seriousness " received less stringent discipline. Id. (quoting McDonnell Douglas, 411 U.S. at 804, 93 S.Ct. at 1825 (emphasis retained)). Moreover, "[c]onduct violative of a single [fire department] regulation may vary considerably in different cases." Moore, 754 F.2d at 1108 n. 5.
 
 
 84
 We find the district court's finding of a pattern and practice to be clearly erroneous because it is based upon comparisons of a series of factually unique and qualitatively dissimilar incidents and a corresponding series of appropriately individualized disciplinary actions which have been imposed in complete consistency with racially neutral and nonarbitrary guidelines.[5] In sum, plaintiff Jones has failed to eliminate the most common nondiscriminatory reasons for the differences in the fight-related discipline handed down by the Department: the nature of the offenses and the nature of the punishments imposed, particularly in relation to the employees' personnel records. Accordingly, we conclude that Jones' evidence of defendant's fight-related discipline has failed to establish a prima facie case of racial discrimination.[6]
 
 4
 
 85
 In addition to the three fights previously detailed, the district court included the Jones-Boillot fight in its comparison of fight-related discipline imposed by the Department. For the reasons stated hereafter, we are satisfied that even if that incident were admissible to establish a pattern or practice, its facts are insufficient to remedy the foregoing inadequacies in Jones' case. Before addressing the evidence surrounding the fight itself, we address its admissibility to show the Department's alleged pattern and practice.
 
 
 86
 Under the terms of the consent decree, relief may be predicated only upon "conduct which constitutes a pattern or practice of unlawful discrimination on the basis of race." Stotts v. Memphis Fire Dep't, 679 F.2d at 575. The district court concluded that the evidence of Jones' and Boillot's demotions was admissible to show the alleged pattern and practice. The interpretation of a consent decree is a matter of law reviewed de novo. Keith v. Volpe, 784 F.2d 1457, 1461 (9th Cir.1986) (citations omitted). We think a more reasonable construction of the decree is that a jurisdictional pre-requisite to consideration of the facts of the plaintiff's claim is proof of the existence of an unlawful pattern and practice, exclusive of his claim. Logically, under the terms of the decree, the court's jurisdiction to assess the comparability of challenged conduct cannot derive from a determination that the challenged conduct is comparable. Rather, Jones must first establish that the Department disparately disciplines black firefighters because of their race before he can introduce evidence of his fight with Boillot and the subsequent demotions. Nonetheless, even if we consider the evidence of the Jones-Boillot altercation in conjunction with the other three fights involving firefighters, we conclude that no pattern and practice of unlawful discrimination has been shown.
 
 
 87
 Jones has failed to offer any proof that race played a factor in the Department's decision to remove both him and Boillot from supervisory capacities. Nor has Jones proved that he, in fact, was disparately disciplined. Boillot was demoted two ranks, from lieutenant to private II. See note 1, supra. Jones was demoted from captain to private II, seemingly three ranks. However, Jones had never been appointed to the intermediate rank of driver and hence was not qualified for the position even through a demotion. Deputy Chief Bryant testified that Jones would not have been eligible to hold the driver's position because he had never been qualified for it. Hence, Jones was effectively demoted only two ranks, the same as Boillot.[7]
 
 
 88
 Nonetheless, even if Jones' demotion is considered more stringent than that of Boillot, there is virtually no credible evidence that such a result was the product of a Departmental racial animus. In analyzing the Department's application of its progressive disciplinary policy, we note that Jones had been disciplined three times previously for fight-related incidents. At the time of the disciplinary panel's investigation, Boillot had only one previous fight-related reprimand. See note 2, supra. In a case involving allegedly disparate discipline, as in a case involving an allegedly discriminatory discharge, "an employee's prior discipline record seems likely to be a major, if not the most important, factor...." Coates v. Johnson & Johnson, 756 F.2d 524, 544 n. 20 (7th Cir.1985). The district court's finding that Boillot was the instigator of the fight is a mitigating factor in Jones' favor. However, it is important to emphasize that this was Jones' fourth separate incident of job-related violence. Simply put, even if Jones was disparately disciplined, and we find he was not, and even if Boillot was the instigator of the fight, there is still no evidence in the record to suggest that the Department's decision to take Jones out of a supervisory capacity was motivated at all by race. Accordingly, we conclude that the court's finding of a racially discriminatory pattern and practice is clearly erroneous and that Jones' evidence of the history of the Department's imposition of fight-related discipline therefore fails to establish a prima facie case of discrimination under the terms of the parties' 1980 consent decree.
 
 B.
 Discipline for Other Major Violations
 
 89
 The district court's finding of a racially discriminatory Departmental pattern or practice in handing down discipline was also predicated upon an instance involving a major violation other than fighting. The court found evidence of racially motivated disparate discipline in the discipline issued to a white captain in a case involving the theft of a firefighter promotional exam.
 
 
 90
 In 1981, Captain Tom Phillips, a white manager in the Department's administration, admitted that both he and a higher ranking official, Chief William Posey, also white, had stolen a copy of a promotional exam for lieutenants. Phillips' confession was obtained after he was confronted with physical evidence implicating his involvement in the theft. Phillips negotiated with the City, ultimately agreeing to testify against his supervisor, Chief Posey, in return for a sixty-day suspension. Based upon Phillips' testimony, the Department terminated Posey. The district court concluded from these facts that Phillips' sixty-day suspension was evidence of disproportionately favorable treatment of a white officer, given that stealing and fighting are both major violations under the Department Manual.
 
 
 91
 Not only did the district court ignore the fact that a white officer, Chief Posey, was terminated rather than simply demoted, but it erred in equating Phillips' factually unique suspension with Jones' factually unique demotion for his fourth on-the-job fight. While fighting and stealing are indeed both major violations under the Manual, see Section 3.802(d) and (f) at section II, supra, Phillips' and Jones' violations are sufficiently factually dissimilar to render any comparison meaningless for purposes of establishing a racially discriminatory pattern and practice. Stealing promotional exams is, at least in a corporeal sense, a relatively victimless crime. Physically striking a fellow firefighter "two, three, maybe four times" and breaking his nose is not. The Department could reasonably conclude that a negotiated suspension of Phillips in return for his testimony against a departmental chief was the most efficient method available of eradicating corruption at higher levels. Jones' case and Phillips' case simply lack "similarity" and "comparability." Moore, 754 F.2d at 1106. We conclude, therefore, that the fatal flaws in Jones' case, initially demonstrated by his proffered evidence on Departmental discipline in the context of fight-related discipline, are not remedied by the proffered evidence on Departmental discipline for other major violations.[8]
 
 C.
 Discipline for Miscellaneous Violations
 
 92
 Jones' proofs on the pattern and practice issue also included evidence of Departmental discipline in four areas of "minor" violations. Those four areas include (1) "hard surface" violations, (2) arrest-related discipline, (3) mistaken transmissions, and (4) falsifying medical consultations. A "hard surface" violation occurs when a firefighter takes fire equipment off of a hard surface road. Employees who are arrested or charged with criminal activity must immediately notify the Department. If the charge is a felony, the employee is customarily suspended without pay until the charges are disposed of in court. A mistaken transmission occurs when one of the Department's communications operators transmits the incorrect address or other information to the engine house. Finally, absences from work must be medically verified.
 
 
 93
 Here, as in Moore, the evidence demonstrates by an overwhelming preponderance that the major violation for which Jones was demoted, fighting, was enforced consistent with the standards set forth in the Department's Manual, i.e., according to the severity of the underlying violations and the participants' personnel histories. Yet those criteria, as in Moore, were virtually ignored by the district court.
 
 
 94
 Moore, a black police sergeant, was demoted to patrolman after being cited to the Civil Service Commission by the police chief and being found by the Commission to be guilty of three major violations: influencing a government official in a matter relating to purely personal advantage, conduct unbecoming an officer, and interference with the proceedings of a trial. Moore's prima facie case was based entirely on an attempt to show that he had been treated less favorably than white officers who had committed similar forms of misconduct. The Moore court noted that the violations for which Moore was disciplined had been consistently enforced, but that the
 
 
 95
 consistency escaped notice below because the district court in its findings of fact attempted comparisons that ranged widely through the police department code of conduct, reaching ad hoc judgment about the reprehensibility of Moore's violations relative to other officers' use of profanity, abuse of alcohol, and absence from work without leave. These conclusions acknowledge no deference to the police department classification of violations, no application of the Solem v. Helm [463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983) ] criteria for comparing offenses and, in short, no basis whatsoever for the asserted correspondence of conduct. Without attempting to establish a single process of comparison for the vast variety of disciplinary situations, we may safely say that in this case a principled determination of "comparable seriousness" required at least initial deference to the system of offenses created by the police department, an administrative agency of the City of Charlotte. The departmental scheme may of course be disregarded if arbitrary or capricious. But in here judging "similarity" without the discipline of that initial guidance and without the application of the Solem criteria, the fact-finding process strayed into clear error.
 
 
 96
 Moore, 754 F.2d at 1108-09 (footnotes omitted).[9]
 
 
 97
 Similarly, the court below gave no deference to the Fire Department's classification of violations as "major" or "relatively minor." Nor did it note the fact that minor violations are typically enforced by many different officers working in fifty different engine houses on different shifts, whereas the discipline for major violations is typically imposed by a single officer, the Director of Fire Services. Finally, the court offered no principled basis for equating Jones' violation, an intentional violent act against a fellow firefighter, with other firefighters' negligent acts or intentional acts against property. See note 9, supra. In short, the district court's pattern and practice analysis is structurally flawed because it is based on an unprincipled conception of similarity and comparability of major and minor violations. See Moore, 754 F.2d at 1106. Accordingly, we are left with the ineluctable conclusion that Jones has failed to carry his "ultimate burden" of proving that similarly situated black firefighters were disparately disciplined for miscellaneous offenses of comparable seriousness because of their race. Segar, 738 F.2d at 1268 (quoting Burdine, 450 U.S. at 253, 101 S.Ct. at 1093).
 
 D.
 Jones' Anectodal Evidence
 
 98
 Lastly, Jones offered anectodal evidence of individual actions within the Department which he alleged were racially-tinged.Anectodal testimony recounting personal experiences of discrimination plays an important role in Title VII litigation. "Such testimony may '[bring] the cold numbers convincingly to life.' "
 
 
 99
 Segar, 738 F.2d at 1277 (citing Valentino v. United States Postal Service, 674 F.2d 56, 68 (D.C.Cir.1982) (quoting Teamsters, 431 U.S. at 338-39, 97 S.Ct. at 1855-56)).
 
 
 100
 Jones proffered evidence that several Departmental employees had received discipline ranging from written reprimands to mandatory apologies for using racial epithets on the job.[10] The relevance of these concededly deplorable racial epithets, as a whole, is questionable. First, only one of these remarks was attributed to a supervisor. The other two were made by lower-ranking personnel.
 
 
 101
 Not only is it hard to see how an isolated racial slur could be thought a significant enough event to count as employment discrimination; it is unclear what practical steps an employer could take to purge all racially offensive speech from the work place. An employer "is not charged by law with discharging all Archie Bunkers in its employ." Howard v. National Cash Register Co., 388 F.Supp. 603, 606 (S.D.Ohio 1975). That would be an unrealistic burden.
 
 
 102
 Hunter v. Allis-Chalmers Corp., Engine Div., 797 F.2d 1417, 1421 (7th Cir.1986). Second, in all three instances the Department took immediate action to discipline each employee. Third, even though the discipline in each case fell short of demotion, the violations, although certainly meriting some form of discipline, were simply not comparable to an intentional act of physical violence against another's person. See note 9, supra.
 
 
 103
 In addition, Jones offered two other anectodal pieces of evidence which the district court found persuasive. First, Lieutenant Ronald Moore, who is black, testified that he was transferred to another engine house after three white firefighters under his command requested that they be transferred. Moore testified that the white deputy chief who approved the transfer, Robert Stott, told Moore that the reason for the transfer was to give the white men "some relief." Second, Jones offered evidence that Deputy Chief Robert Smith, who is white, once sat in on a disciplinary hearing for a black lieutenant because, in the district court's words, "he felt that an all-black disciplining inquiry would cause 'controversy.' " Lieutenant John Alsobrook, black, was scheduled to be disciplined by his District Chief, Floyd Newsum, who is also black.
 
 
 104
 While the Department offered some evidence that these two decisions were unmotivated by racial animus,[11] we simply note that Jones' evidence, at best, shows no more "than the mere occurrence of isolated ... sporadic discriminatory acts." Teamsters, 431 U.S. at 336, 97 S.Ct. at 1855. When viewed in the context of Jones' entire case, these two instances fail to show the repeated, routine, or generalized denial of rights necessary to constitute a pattern or practice of discrimination. Id. at 336 n. 16, 97 S.Ct. at 1855 n. 16. Although not entirely irrelevant, Jones' anectodal testimony, even when considered together with all the other evidence of departmental discipline, is insufficient to make out a case of a pattern and practice of racial discrimination.
 
 
 105
 We are left with the definite and firm conviction that the district court erred in finding that the Memphis Fire Department engaged in a pattern or practice of administering disparate discipline on the basis of race. That being so, under the terms of the parties' 1980 consent decree, the district court was, therefore, without jurisdiction to hear this case.
 
 V.
 
 106
 For the foregoing reasons, we REVERSE the judgment of the district court and dismiss plaintiff's complaint for lack of jurisdiction.
 
 
 107
 MERRITT, Circuit Judge, dissenting.
 
 
 108
 After a lengthy trial, District Judge Robert McRae found that numerous instances of unequal disciplinary treatment of black firemen in Memphis constitute a pattern or practice of discrimination within the fire department. Judge McRae's conclusion is based on detailed findings of fact.
 
 
 109
 The Court has decided to re-try the facts of the case on appeal and has reached a different conclusion. Anderson v. City of Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985), explicitly prohibits reviewing courts from duplicating the factfinding role of the lower courts. The Court ignores this principle. Even worse, the Court twists reason to achieve a result which, in my judgment, can only be described as wholly illogical.
 
 
 110
 The majority acknowledges that many instances of "facially" unequal treatment in the fire department exist, as Judge McRae found. It simply concludes without reasonable explanation that they are either not "comparable" with the Jones-Boillot fight or represent "the mere occurrence of isolated sporadic discriminatory acts."
 
 
 111
 Judge McRae found that Jones' evidence was enough to "clearly show a cumulation of events that meets the burden of persuasion as to the existence of illegal discrimination in the Memphis Fire Department." D.Ct. opin. at 20. In order to reverse Judge McRae's findings based on the evidence, the majority goes so far as to hold that the very facts of the instant case showing unfair treatment of the black firefighter cannot even be considered in determining the existence of a pattern or practice of discrimination:
 
 
 112
 The district court concluded that the evidence of Jones' and Boillot's demotions was admissible to show the alleged pattern and practice. The interpretation of a consent decree is a matter of law reviewed de novo.... We think a more reasonable construction of the decree is that a jurisdictional prerequisite to consideration of the facts of the plaintiff's claim is proof of the existence of an unlawful pattern and practice, exclusive of his claim. Logically, under the terms of the decree, the court's jurisdiction to assess the comparability of challenged conduct cannot derive from a determination that the challenged conduct is comparable. Rather, Jones must first establish that the Department disparately disciplines black firefighters because of their race before he can introduce evidence of his fight with Boillot and the subsequent demotions.
 
 
 113
 Opin., pp. 297-298. No authority is cited or reason advanced for this strange proposition. The Court simply reaches its result by stating that it is not logical to consider the discrimination in this case as part of the evidence of a pattern, and then by disposing of the other pattern evidence by stating either that other instances of apparent discrimination "are sufficiently factually dissimilar to render any comparison meaningless," opin., p. 300, or are "mere isolated sporadic discriminatory acts," opin. p. 302. I cannot go along with this kind of reasoning. By the Court's "logic," one could never prove a pattern of discrimination because the last discriminatory act in the pattern does not count, while all of the previous acts are to be viewed in isolation from each other. Such an approach is inconsistent with common sense, and such a re-evaluation of the District Judge's findings of fact is inconsistent with Bessemer City.
 
 
 114
 The majority acknowledges that the District Court found that the white firefighter started the fight and ended up getting less punishment than the black firefighter he attacked. But the majority refuses to add this instance of discrimination to the numerous other instances of apparent discrimination in the past. Through a process of reasoning that seems result-oriented to me, the Court finds that no discrimination occurred at all. Judge McRae, though, is the authoritative factfinder under the principle of Bessemer City. He found that the black firefighter was more credible than the white firefighter (D.Ct. opin. at 20), that the evidence of disparate discipline was "pervasive" (D.Ct. opin. at 17), and that "explicit racially derogatory remarks and decisions still exist disgustingly in the Fire Department," (D.Ct. opin. at 17-18). Judge McRae's factual analysis is far more sensible than the Court's and demonstrates a much greater familiarity with the record and the long-standing discriminatory conditions in the Memphis Fire Department. As stated in Bessemer City,
 
 
 115
 The rationale for deference to the original finder of fact is not limited to the superiority of the trial judge's position to make determinations of credibility. The trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise. Duplication of the trial judge's efforts in the court of appeals would very likely contribute only negligibly to the accuracy of fact determination at a huge cost in diversion of judicial resources.... [T]he trial on the merits should be "the 'main event' ... rather than a 'tryout on the road.' "
 
 
 116
 470 U.S. at 574-75, 105 S.Ct. at 1512 (citation omitted). Because the Court disregards the pattern of discrimination which this record shows and which the District Court found after a full trial on the merits, I respectfully dissent.
 
 
 
 [1]
 The ranks within the Department are, from highest to lowest, deputy chief, district chief, captain, lieutenant, driver, private II and private I
 
 
 [2]
 Boillot was reprimanded on April 30, 1984 for disobeying a direct order in March 1984. Obviously, this information was not available to the panel which disciplined Boillot in November of 1983
 Further, in September of 1983, following his reprimand for "over-reacting," Boillot voluntarily admitted himself to the 004 Program, a City-sponsored program for employees with alcohol, drug, or emotional problems who volunteer for treatment. A firefighter's participation in the program is confidential and, according to the unrebutted testimony of District Chief Jerry Bryant, a member of the panel which disciplined both Jones and Boillot, may not form a basis for subsequent disciplinary actions.
 
 
 [3]
 As the district court noted, "[i]t is apparent that the written reprimand Captain Jones received in 1975 was considered, although it was to be removed from his personnel file after one year." However, the fight was apparently separately documented in Jones' annual performance report for the period ending June 28, 1975. Annual performance reports, unlike written reprimands, apparently remain a permanent part of an employee's personnel record
 
 
 [4]
 For purposes of introducing evidence of the Department's alleged pattern and practice, the district court limited the parties to instances arising after the entry of the 1980 consent decree. Since, according to the decree's own terms, the plaintiffs have waived any further relief save to enforce the decree, see Firefighters v. Stotts, 467 U.S. 561, 565-66, 104 S.Ct. 2576, 2580-81, 81 L.Ed.2d 483 (1984), and since the Department's current Manual of Rules and Regulations was not formulated until 1979, we agree
 
 
 [5]
 See, e.g., Mozee v. Jeffboat, Inc., 746 F.2d 365 (7th Cir.1984), in which the court noted the limited relevance of factually specific instances of discipline: "Of course, the difficulty of showing comparability of situations is a significant limitation." Id. at 372 (citations omitted)
 
 
 [6]
 See, e.g., Potter v. Goodwill Industries of Cleveland, 518 F.2d 864, 865 (6th Cir.1975) (per curiam), in which we held a prima facie case of discriminatory employment conditions to be established by a showing that the plaintiff "is a member of a class entitled to the protection of Title VII, and that he is accorded treatment different from that accorded persons otherwise similarly situated who are not members of the class." (Emphasis added.)
 
 
 [7]
 The court reasoned that Jones "was demoted the two ranks through which he came to be a Captain. It seems that he should go down the same way he came up unless he was discriminated against because he was black." Through his demotion, Jones went down the ranks the same way he came up, which was from private to lieutenant to captain, bypassing the intermediate rank of driver
 
 
 [8]
 In fact, the district court summarily concluded with respect to the major violations contained in Section 3.803 of the Manual that "whites never received as severe discipline as Captain Jones received for this incident [with Boillot]." Not only does this conclusion ignore the Department's dismissal of Chief Posey in 1981, but it also ignores the following: Chief Donald Sherman was dismissed in 1985 following his conviction for income tax evasion; James Travis, Clower Johnson, and John Stanley were dismissed for criminal conduct during the relevant time period; and an individual named "Huddleston" was apparently dismissed in 1981 for alcohol abuse. All six former firefighters are white
 
 
 [9]
 The Moore court recognized that
 Solem v. Helm involved the procedurally different case of an Eighth Amendment challenge to a state criminal sentence. Although the standard of review may change with the transition from the criminal to the civil context, the considerations relevant in Solem remain relevant when comparing offenses in private disciplinary cases.
 754 F.2d at 1108 n. 4.
 In Solem, the Court held that by applying certain stated factors, "courts are competent to judge the gravity of an offense, at least on a relative scale." Solem, 463 U.S. at 292, 103 S.Ct. at 3011. "For example, as the criminal laws make clear, nonviolent crimes are less serious than crimes marked by violence or the threat of violence.... [T]he State recognizes that the criminal law is more protective of people than property." Id. at 292-93, 103 S.Ct. at 3011. Further "[m]ost would agree that negligent conduct is less serious than intentional conduct." Id. at 293, 103 S.Ct. at 3011.
 
 
 [10]
 A black personnel assistant in the Fire Administration Bureau testified that a white employee received a written reprimand for calling her a "nigger." The white employee was also warned that any further related incident would result in his suspension or termination. District Chief Gerald Lester (white) was ordered to apologize to District Chief Floyd Newsum (black) after Lester referred to an apparatus as "nigger-rigged" at a meeting attended by Newsum. In addition, a white probationary lieutenant in the Fire Alarm Bureau was given an oral reprimand after calling a black co-worker a "lying sumbitch." There is no direct evidence, however, that the lieutenant's remark was motivated by racial animus
 
 
 [11]
 The Department offered testimony that the dispute between Moore and the three subordinate white firefighters was personal, that Stott thought it would be easier to transfer one person than three, and that after the transfer the three white firefighters still remained under the command of a black captain and black district chief
 Deputy Chief Smith testified that he attended Lieutenant Alsobrook's disciplinary hearing to learn first-hand about the incident because of the serious nature of the allegations (poor firefighting) and that he took part in the issuance of discipline.