EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,

v.

**O & G SPRING AND WIRE FORMS SPECIALTY COMPANY, Defendant.**

No. 85 C 9966.

United States District Court, N.D. Illinois, E.D.

Dec. 14, 1988.

---

John Hendrickson and Mary B. Manzo, U.S. Attys., E.E.O.C., Kathleen Mulligan, Chicago, Ill., for E.E.O.C.

Andrew W. Levenfeld, Gerard C. Smetana, Philip T. Powers, Levenfeld & Aronson, Ltd., Chicago, Ill., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

LEINENWEBER, District Judge.

In accordance with Fed.R.Civ.P. 52(a) the court finds that the facts specifically as set forth in the following Findings of Facts and states the following Conclusions of Law. To the extent any of the findings reflect legal conclusions they shall be deemed conclusions and to the extent that any of the conclusions as stated reflect factual findings they shall be deemed findings.

## FINDINGS OF FACT

### I. Parties

1. The Equal Employment Opportunity Commission ("EEOC") is the agency of United States charged with the administration and enforcement of Title VII of the Civil Rights Act of 1964 and of the Age Discrimination Employment Act of 1967 ("ADEA"). O & G Spring and Wire Forms Specialty Company ("O & G") is a corporation with its offices and factory located at the southwest corner of Division and Kostner Streets in the City of Chicago.

### II. Jurisdiction and Venue

2. The court has jurisdiction over the parties and subject matter of this action under Title VII and the ADEA.

3. Venue is proper under 28 U.S.C. § 1391(b).

4. O & G is an employer in an industry affecting commerce within the meaning of 42 U.S.C. §§ 2000e(g), (h) and 29 U.S.C. § 203.

5. All conditions precedent to suit have been satisfied by the EEOC. Specifically, one Walter Harris filed a charge of discrimination alleging race discrimination under Title VII and age discrimination under the ADEA with the EEOC on October 22, 1984 (plaintiff's ex. 1). He had applied for and been denied employment by O & G within the three hundred day period preceding the filing of the charge (plaintiff's ex. 345). The EEOC deferred the charge to the Illinois Department of Human Rights which waived its initial right to process the charge. O & G received notice of the charge, the EEOC investigated the charge, and on July 8, 1985 the District Director of the EEOC issued a letter of determination and letter of violation finding reasonable cause to believe that O & G had continuously discriminated against blacks and persons over the age of forty as a class in recruiting and hiring (plaintiff's ex. 11). A copy of this determination was received by O & G (Tr. 512–13). The EEOC attempted to conciliate the charge, was unsuccessful, and on July 24, 1984 O & G was advised that the EEOC's efforts to conciliate the charge were unsuccessful.

III. Background Facts About O & G

6. O & G is in the business of making springs and specialty forms from wire to order. Its customers include part suppliers to the automobile manufacturers, and other manufacturers and assemblers of products needing springs. It enjoys an excellent reputation for quality workmanship in its field (Tr. 754–55). It is a corporation with fifty percent of its shares owned by its president, Ted Grzeszkiewicz ("Grezeszkiewicz"), and fifty percent by its secretary/treasurer, Joseph Olinyk.

7. The company was started by Grezeszkiewicz in 1966 at Addison, Illinois and moved to its present location at the southwest corner of Division and Kostner in 1970.

8. Grzeszkiewicz was born in Poland, speaks fluent Polish, and English with a decided accent. Prior to forming O & G he worked for sixteen years as a tool designer and trouble shooter for American Spring & Wire ("American Spring"), a company that also specialized in making springs and other wire products. When Grzeszkiewicz left American Spring to form O & G in 1966, American Springs' work force was approximately ninety percent Polish-born and speaking. When he started up O & G he needed people and some of the American Spring people came over to O & G to work for him.

9. Throughout the 1970's O & G employed a modest work force of twelve to fifteen persons, which included three plant clerical people. In the early 1980s the work force began to increase. For the pay period ending March 31, 1981 O & G employed a total of forty. On March 31, 1982 O & G employed a total of forty-four people. On March 31, 1983 O & G employed a total of forty-one people. On March 31, 1984 O & G employed fifty-seven people. On March 31, 1985 O & G employed fifty-three people and on March 31, 1986 it employed forty-seven people (plaintiff's ex. 342A). These numbers include at least two or three clerical people for each year as well as certain skilled workers and supervisory employees.

10. The work of O & G involves low-skilled employees who operate kick and punch presses. O & G also employs skilled employees in tool and die making, heat treating and grinding. While past experience is desirable for the low-skilled jobs it is not necessary. Only the low-skilled category is involved in these Title VII and ADEA claims.

11. For the time period encompassed in this suit (1979 through 1987), O & G hired ninety-nine people for low-skilled jobs, of which five were black. However for the seven years, 1979 through 1985, when eighty-seven persons were hired for low-skilled jobs, no blacks were hired, while in 1986 and 1987 twelve persons were hired for these jobs, of which five were black (plaintiff's ex. 351A).

12. O & G has used employment applications since at least 1977. Applications

are available only since 1983, those earlier having been legally destroyed. These applications indicate that slightly more than fifty percent of the persons hired were Polish and fifteen percent were Hispanic. Those employees identified as Polish or Hispanic indicated on employment applications that they either spoke Polish or Spanish, were educated in Poland or in a Spanish-speaking country, or were employed in Poland or in a Spanish-speaking country (plaintiff's ex. 366).

13. During the same period two hundred eleven applications were turned down, twelve and seven tenths percent were black, fifteen percent Polish, and thirty-two percent Hispanic.

14. There was a dramatic increase in the number of black applications after the complaint was filed with by EEOC. For the years 1984 and 1985, out of a total fifty-eight applications, four were black or approximately seven percent. For the years 1986 and 1987, twenty-seven out of one hundred fifty-four applications were black, or seventeen and one-half percent. It was in 1986 that O & G first began hiring blacks into unskilled positions.

15. In 1986, of the thirteen persons hired for shop work, three were black, nine were Polish and none were Hispanic. In 1987, of the six persons hired, three were black, two were Polish and one was Hispanic.

16. O & G relies almost entirely upon word of mouth to recruit applicants for its low-skilled jobs. It has never consulted the Illinois Job Service. On one occasion in the early 1980s it advertised in the Chicago Tribune for a shipping clerk and on another occasion in the early 1980s it advertised for skilled positions in the Polish language press. However the main source of information was from current employees of prospective applicants who would be available for employment with the company. The company exercises a strong preference in hiring to the personal recommendations of present employees (plaintiff's ex. 21, defendant's answers to interrogatories No. 4).

17. Of the seventy-one people hired at O & G between 1979 and 1985, twenty were age forty or older, forty-seven were under forty, and four did not have an available age. Factoring out the four whose ages were unknown, therefore thirty percent of the hires were forty or older and seventy percent of the hires were younger than forty. Thirteen of the new hires were forty-five or older, or nineteen and four tenths percent (plaintiff's ex. 416). When only considering unskilled jobs by age O & G did a little better. From 1979 through 1987, eighteen percent of those hired in unskilled jobs were forty-five or older.

18. During 1984 through 1987, the period of time in which O & G maintained its applications, O & G received approximately two hundred fifty-seven applications and hired fifty individuals (including two who were rehired), or roughly twenty percent. Forty-four of the total applicants indicated they were forty or older, of which O & G hired twenty-two or fifty percent. Of the two hundred fifteen applicants not hired during this period, one hundred six did not give their ages on the application. Assuming that the age distribution of those who did not give their ages parallel those that did, then approximately forty-four of the applicants not hired were more than forty. Under this hypothesis O & G hired approximately one-third of those over forty. Piecing together information from several exhibits, specifically plaintiff's Nos. 34 and 342, it would appear that as of June 30, 1986, of the fifty-three people then employed, twenty-seven were forty and older or fifty-one percent.

IV. Statistical Evidence of Discrimination According to Testimony of Pierre de Vise

19. Dr. Pierre de Vise ("de Vise"), Professor of Roosevelt University School of Urban Planning, was retained by the EEOC to determine the relevant labor market for the low-skilled workers at O & G.

20. Taking the residential origins reflected on applications produced by O & G by a mile ring from the O & G site for the years 1979 through 1987, and taking the percentage of black machine operators located in the same mile ring according to the 1980 census, de Vise determined that in

the period from 1979 through 1987 there was an approximate twenty-three percent black availability (plaintiff's exs. 386–88).

21. de Vise then determined the number of blacks working as operatives, that is low-skilled jobs, for employers in O & G's EEO–1 reporting zip code (60651) and the eight zip codes surrounding O & G, and determined that the percentage of employees in the operative jobs for the years 1980 through 1985 varied from a low of twenty-six and seven tenths percent in 1982 to a high of twenty-eight and eight tenths percent in 1985. Private sector employers of one hundred or more employees, or employers with fewer than one hundred employees at a specific location if the employer had a total of one hundred employees at all locations, or a government contractor employer regardless of the number of employers, are required to file annually a document called EEO–1 Annual Survey listing, *inter alia,* the race of workers by categories. de Vise selected "operatives" which is defined as

> "Operatives (semi-skilled)—Workers who operate machine or processing equipment or perform other factory-type duties of intermediate skill level which can be mastered in a few weeks and require only limited training. Includes: apprentices (auto mechanics, plumbers, bricklayers, carpenters, electricians, machinists, mechanics building trades, metal-working trades, printing trades, etc.), operatives, attendants (auto service and parking), blasters, chauffeurs, delivery workers, dressmakers and sewers (except factory), dryers, furnace workers, heaters (metal), laundry and dry cleaning operatives, milliners, mine operatives and laborers, motor operators, oilers and greasers (except auto), painters (except construction and maintenance), photographic process workers, stationary firefighters, truck and tractor drivers, weavers (textile), welders, and flame-cutters, and kindred workers" (plaintiff's ex. 397).

22. Finally, de Vise determined, again according to census data, that the percentage of blacks in the various categories of operators was higher in the City of Chicago than it was in Cook County which, in turn, was higher than the six-county SMSA. It ranged from thirty-five and one tenth percent of all operators, fabricators and laborers in the City of Chicago being black to twenty-two and one-half percent being black in the six-county SMSA.

23. It was de Vise's opinion that all of these percentages understated the availability of blacks because all of these statistics excluded unemployed and the percentage of black unemployment exceeded that of white by two or three times. He also opined that these figures understated blacks because blacks are available for low-paying jobs such as O & G in a greater percentage than whites because they have less training and those with less training are unemployed in greater percentages.

24. Finally, using these percentages as indicative of the relevant labor market he determined of O & G's eighty-seven total hires between 1979 through 1985, using the most conservative rate of punching and stamping press machine operators in the City of Chicago, of twenty-two and one-half percent (plaintiff's ex. 390) the number of hires expected in a color-blind process would have been nineteen and six tenths percent blacks; using the availability of black machine operators by areas of residence (plaintiff's ex. 388) the number of hires expected was twenty and one tenth percent blacks; and using the percentage of blacks employed as operatives in O & G's home zip code of 60651 being thirty-one and eight tenths percent would indicate the number of black hires expected to be twenty-seven and seven tenths percent (plaintiff's ex. 389).

25. Finally, using standard deviation analysis with a statistical disparity between actual and expected number of blacks hired by O & G indicated a projected probability of less than three in one million for each calculation that O & G would have hired no blacks into unskilled positions using a color-blind process.

### Age

26. According to de Vise, using 1980 census figures, the percentage of machine operators forty-five years and older in the

Chicago-area labor force in 1980 ranged between thirty-six and six tenths percent for metal working and plastic working machine operators to thirty-seven and seven tenths percent for machine operators and tenders of Cook County 1980. He opined that based upon these figures O & G's actual hires from 1979 through 1987 of seventeen forty-five and older low-skilled employees, was approximately one-half of what would have been expected.

27. Again using statistical disparity of numbers in standard deviation analysis, the projected probability resulted in probabilities of the range of two to seven out of one hundred thousand.

### Testimony of Dr. Glen Meyers

28. Defendant called as its expert, Dr. Glen Meyers ("Meyers"), a labor economist.

29. Meyers attacked de Vise's labor market categories as too imprecise to be relied upon because all of his categories included large employers as well as small employers. This is important because small employers lack formal training programs and consequently need to hire people with more experience than do large employers who have in-house training programs available. Also, the kick presses used by O & G's unskilled labor are manually operated and are more difficult to operate than stamp presses which are automated. All of de Vise's figures include both.

30. Accordingly, it was Meyers' opinion that none of the categories used by de Vise was reliable. In Meyers' opinion the EEOC should have taken a survey within a five mile radius of the O & G plant to identify the race of workers who have jobs similar to a kick press at small companies like O & G. Since this was not done it is impossible to determine the percentage of blacks in the relevant labor market because the relevant labor market was not determined.

31. It was Meyers' opinion that the relevant labor market for O & G is top heavy with recent immigrants who do not speak English because O & G, paradoxically needs higher skilled employees who will work for lower pay than do larger employers who, more probably unionized, would

be willing to take lower skilled employees without any training at higher rates of pay. It was his opinion that recent immigrants, particularly those not speaking English, less knowledgeable about the labor market, would be more willing to take the harder work and harsher conditions with lower pay that was offered by O & G and similar companies.

32. Meyers attempted to discount the marked increase of blacks in application flow since 1986. In his opinion this increase resulted from three factors interacting: 1) the change in the immediate neighborhood which went from approximately ten to fifteen percent black in 1984 to approximately fifty percent black in 1986, 2) the opening in 1986 of a flea market across the street from O & G which greatly increased weekend pedestrian traffic, a high percentage of which was black, and 3) decline of employment in the area due to closure of manufacturing operations.

33. According to Meyers, those seeking work, particularly at entry level, are more likely to be unemployed. In fact analysis of O & G's employment applications indicated that ninety percent of those applying indicated they were in fact unemployed. Accordingly, de Vise should have used the percentage of those over forty-five who were unemployed in the particular employment category as the relevant labor market for forty-five year olds. According to labor statistics for the first quarter of 1988 only twenty-seven and eight tenths percent of unemployed job seekers were forty-five years and older. He further reasoned that employed persons were much less likely to seek entry level positions and the ranks of the unemployed contained a relatively greater number of unskilled than skilled workers. He further opined that older workers tend to have more experience than younger workers and accordingly would be less likely to apply for entry level positions such as is available at O & G.

34. Specifically, Meyers testified that O & G's hiring procedure of relying on word-of-mouth and walk-ins was reasonable because 1) O & G needed skilled craftsmen, 2) there was a relative shortage of such

craftsmen, 3) it was unable to initiate and maintain a formal internal training program, 4) most Polish-born workers had technical training in high school, 5) O & G had an inability to deal with the kind of numerical applicant flow that would result from placing ads in newspapers, and 6) of low cost.

35. Meyers also opined that O & G's preference for a technical training background in its entry level employees was reasonable and a business necessity because 1) O & G needed to obtain from the labor supply in an economical manner individuals who were capable of moving into skilled positions because of its lack of training, 2) its need to avoid employee error, 3) it needed employees capable of frequently adapting and re-adapting because of a wide variety of production runs, and 4) because of the relative difficulty of operating the manual kick press.

Court's Finding Regarding Discrimination

36. The court finds that there is a certain amount of truth in the testimony of de Vise and in the testimony of Meyers.

37. Given the background of O & G, i.e., its founder being a Polish immigrant speaking fluent Polish, and the fact that O & G had its start-up with Polish employees taken from American Spring, it is obvious that Polish immigrants would be drawn to work at O & G in numbers in excess of Polish immigrants in the work force at large. It is certainly reasonable to expect that employees who do not speak English would be more comfortable working for a company that has a large number of Polish-speaking employees. It is also to be expected that immigrant populations would have a network to communicate the availability of jobs in Polish-speaking surroundings. The same would be true for Hispanic immigrants who also would be expected to be drawn to an employer that has a substantial number of Hispanic-speaking employees.[1]

38. It is also reasonable to expect that recent immigrants would be willing to work at lower pay and under poorer conditions as an offset for comfort in the language setting.

39. It is also reasonable for an employer such as O & G to have a preference for employees with experience or a technical background because of its lack of a training program and its desire to promote to skilled jobs from within rather than to incur the expense of advertising for skilled employees.

40. However no explanation is sufficient to overcome the "inexorable zero" employment of blacks at O & G from 1979 through 1985. Given that the statistics of de Vise may be skewed, black availability in the relevant labor market would have to be reduced to three percent in order to get any sort of reasonable statistical probability of zero black hires. Defendant has failed to demonstrate this probability. In fact anectdotal evidence presented by the EEOC has demonstrated that blacks did apply before 1987 in substantial numbers.

41. The EEOC makes much of the fact that O & G has hired a number of blacks since it filed this suit. The implication the EEOC wishes to make is that O & G quit discriminating at that time. This implication certainly is strong. However the high percentage of blacks hired may partially be a result of O & G "bending over backwards" to appear to be not discriminating (testimony, Dr. Bloch) or a result of "word-of-mouth" (see fn. 1, *infra*).

42. In summary, the court finds as a matter of fact that O & G during the period of 1979 through 1985 engaged in a pattern and practice of class discrimination against blacks on account of their race, in both recruitment and hiring for entry level jobs.

Court's Finding Regarding Age

43. Venue in this district is proper under 28 U.S.C. § 1391(b).

44. The charge of discrimination underlying this action provides a proper basis for jurisdiction over the EEOC's class-wide recruitment claim.

---

1. In fact the number of blacks currently working for O & G may through word-of-mouth be partially responsible for the increase in numbers of black applicants currently being experienced by O & G.

45. The court finds however that the EEOC has failed to prove that O & G discriminated on the basis of age. According to the analysis of de Vise O & G hired approximately eighteen percent of employees forty-five or older. He compared this with the percent of those employed in Chicago, Cook County and the SMSA of forty-five and older which was approximately thirty-seven percent. However an analysis of O & G's work force indicates that in June of 1986 over fifty percent of those employed at O & G were over forty-five. There is apparently no statistic available as to the age of those employed in any specific labor market. de Vise's attempt to compare age at hiring at O & G with the age of those employed in the relevant labor market is comparing apples to oranges. The only valid comparison would be between the age of those employed at O & G with the age of those employed in the relevant labor market. Since the number employed at O & G at age forty and older is greater than the age of those employed in the relevant labor market used by de Vise, the statistics suggest that O & G is not in violation of ADEA.

The court so finds.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over the parties and the subject matter of this Title VII action. Venue in this Northern District of Illinois Eastern Division is proper. The charge of discrimination underlying this action provides a proper basis for jurisdiction over the EEOC's class-wide recruitment and hiring claim because they were either stated in the charge itself or were developed in the course of reasonable investigation of the charge. All conditions precedent to the institution of this litigation have been fulfilled.

2. This is both a "disparate treatment" and a "disparate impact" case, as to both race and age. Moreover, it is a "pattern and practice" case in that the challenged employment practices respecting recruitment and hiring for low-skilled operative jobs—mostly punch press and kick press operating jobs—were "more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts," but rather were O & G's "standing operating procedure—the regular rather than the unusual practice." *Teamsters v. U.S.*, 431 U.S. 324, 336, 97 S.Ct. 1843, 1855, 52 L.Ed.2d 396 (1977); *EEOC v. Chgo. Miniature Lamp Works*, 622 F.Supp. 1281 (N.D.Ill.1985).

3. Because "the same set of facts giving rise to a disparate treatment case can also be structured to make out a disparate impact case," *Wheeler v. City of Columbus, Miss.*, 686 F.2d 1144, 1150 (5th Cir. 1982), the proof reflected in the court's Findings of Fact is cumulative and establishes O & G's liability under both theories. *See Watson v. Ft. Worth Bank & Trust*, — U.S. ——, 108 S.Ct. 2777, 2787, 101 L.Ed.2d 827 (1988) ("We conclude ... that subjective or discretionary employment practices may be analyzed under the disparate impact approach in appropriate cases."); *EEOC v. Chgo. Miniature Lamp Works, supra*.

Moreover, the cases which allot the burdens of proof in Title VII cases are equally applicable to age cases brought under the ADEA. *EEOC v. Sandia Corp.*, 639 F.2d 600 (10th Cir.1980); *Chern v. Ogden Food Service Corp.*, 33 F.E.P. Cases 1547 (E.D. Pa.1984).

4. Statistical proof relevant in a pattern and practice disparate treatment case involves a showing of significant statistical disparity between the racial composition of the employer's applicant flow, hiring patterns or work force, and the racial composition of the employer's relevant labor market, and is thus "logically different from a *McDonnell Douglas–Burdine* prima facie case." *EEOC v. Chgo. Miniature Lamp Works, supra*, at 622 F.Supp. at 1307. Accordingly, in the instant case the EEOC's case was not and could not have been rebutted "merely through articulation of a legitimate, nondiscriminatory reason," but only proof that the EEOC's statistics were inaccurate or insignificant, or by proof of a non-discriminatory explanation for the discriminatory results. *Id.*, 622 F.Supp. at 1307–08. *See Teamsters, supra; Watson v. Ft. Worth Bank & Trust,*

*supra; Babrocky v. Jewel Food Co.*, 773 F.2d 857 (7th Cir.1985); *Mozee v. Jeffboat, Inc.*, 746 F.2d 365 (7th Cir.1984); *Clark v. Chrysler Corp.*, 673 F.2d 921 (7th Cir. 1982); *Vuyanich v. Republic Natl. Bank of Dallas*, 521 F.Supp. 656 (N.D.Tex.1981); *vacated and remanded on other grounds*, 723 F.2d 1195 (5th Cir.1984); *Markey v. Tenneco Oil Co., Inc.*, 635 F.2d 497 (5th Cir.1981); *Hazelwood School Dist. v. U.S.*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977).

■ 5. In *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), and its progeny, the Supreme Court has outlined the progression of proof in disparate impact cases. *In Conn. v. Teal*, 457 U.S. 440, 446–47, 102 S.Ct. 2525, 2530–31, 73 L.Ed.2d 130 (1982), the Court stated:

> "To establish a prima facie case of discrimination [in a disparate impact case], a plaintiff must show that the facially neutral employment practice had a significantly discriminatory impact. If that showing is made, the employer must demonstrate that 'any given requirement [has] a manifest relationship to the employment in question,' in order to avoid a finding of discrimination."

*See Teamsters, supra*, 431 U.S. at 349, 97 S.Ct. at 1861 ( "[A] prima facie Title VII violation may be established by policies or practices that are neutral on their face and in intent but nonetheless discriminate in effect against a particular group.") To establish liability under the disparate impact theory the EEOC is *not* required to prove discriminatory animus, motive, or intent on the part of O & G. *Grant v. Bethlehem Steel Corp.*, 635 F.2d 1007, 1014 (2nd Cir.1980) ("Proof of motive is not required to sustain a claim of disparate impact."); *EEOC v. Chgo. Miniature Lamp Works, supra*, 622 F.Supp. at 1310 ("Discriminatory motive is . . . irrelevant in disparate impact cases."); *Wheeler v. City of Columbus, Miss., supra*. Thus in *Dothard v. Rawlinson*, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977), the Supreme Court stated that "a plaintiff need only show that the facially neutral standards in question select applicants for hire in a sig-

nificantly discriminatory pattern." *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). Finally, as noted in *EEOC v. Chgo. Miniature Lamp Works, supra*, 622 F.Supp. at 1310, "Because disproportionate impact is not measured in an individual case but upon a minority *group*, statistics are naturally the key to getting a disparate impact case off the ground."

■ 6. It is beyond cavil that statistical proof *alone* is sufficient to establish liability under both the disparate treatment and disparate impact of models. *Watson v. Ft. Worth Bank & Trust, supra; Teamsters, supra; Mister v. Ill. Central Gulf RR Co.*, 832 F.2d 1427 (7th Cir.1987); *Shidaker v. Carlin*, 782 F.2d 746 (7th Cir.1986), *vacated and remanded on other grounds*, 481 U.S. 1001, 107 S.Ct. 1621, 95 L.Ed.2d 195 *on remand*, 833 F.2d 627 (7th Cir.1987); *U.S. v. City of Chgo.*, 549 F.2d 415 (7th Cir.1977); *Payne v. Travenol Labs, Inc.*, 673 F.2d 798 (5th Cir.1982), *cert. denied*, 459 U.S. 1038, 103 S.Ct. 451–52, 74 L.Ed.2d 605; *Grant v. Bethlehem Steel Corp., supra*.

■ 7. Further, statistical evidence is sufficient to establish a pattern and practice of discrimination. *Hazelwood School Dist. v. U.S., supra; EEOC v. American Natl. Bank*, 652 F.2d 1176 (4th Cir.1981); *Markey v. Tenneco Oil Co.*, 635 F.2d 497 (5th Cir.1981). Work force (or EEOC–1) statistical data alone is sufficient to establish liability for periods with respect to which particularized applicant flow and hiring data has not been made available. *Teamsters, supra; EEOC v. Chgo. Miniature Lamp Works II*, 640 F.Supp. 1291, 1295–96 (N.D.Ill.1986) ( [Although applicant flow and hiring data available only from 1978 until the employer's last hire in 1981, *Chgo. Miniature, supra*, 622 F.Supp. at 1319–20,] "EEOC's evidence proved a discriminatory underrepresentation of blacks in Chicago Miniature's *work force* throughout the 1970–81 period. That led to the conclusion Chicago Miniature's *pattern and practice of discrimination . . . had continued throughout that period.*" [emphasis added] )

■ 8. Because disparate impact focuses upon the *results* of facially neutral employment practices, the importance of statistics in establishing liability under the disparate impact model is obvious. On the other hand under the disparate treatment model the necessary degree of purposefulness or "intent" is inferred from the numbers. *See Watson v. Ft. Worth Bank & Trust, supra.* This inference is compelled *not* because Title VII requires a particular balance in an employer's work force or that the work force precisely "mirror" the composition of the relevant labor market but rather because gross disparities between an employer's applicant flow, hiring or work force and its relevant labor market show the existence of discriminatory employment practices:

"Statistics showing racial or ethnic imbalance are probative in a case such as this one only because such imbalance is often a telltale sign of purposeful discrimination; *absent explanation, it is ordinarily to be expected that nondiscriminatory hiring practices will in time result in a work force more or less representative of the racial and ethnic composition of the population in the community from which employees are hired.* Evidence of longlasting and gross disparity between the composition of a work force and that of the *general population* thus may be significant even though ... Title VII imposes no requirement that a work force mirror the general population."

*Teamsters, supra,* 431 U.S. at 339, n. 20, 97 S.Ct. at 1857, n. 20 (emphasis added). *See Wilkins v. University of Houston,* 654 F.2d 388, 395 (5th Cir.1981) ("[W]here the statistical showing is sufficiently strong in a disparate treatment action, plaintiff's prima facie case can be made without additional evidence establishing that defendant purposefully treated minorities protected under Title VII less favorably than other persons."); *U.S. v. Ironworkers Local 86,* 443 F.2d 544, 551 (9th Cir.1971), *cert. denied,* 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971) ("In many cases the only available avenue of proof is the use of racial statistics to uncover clandestine and covert discrimination by the employer.")

■ 9. The EEOC's statistical proof established a *prima facie* case of race discrimination in recruiting and hiring. The explanations of O & G for this disparity partially but do not completely explain this numerical disparity. The court concludes that O & G has not explained away the "inexorable zero." *U.S. v. T.I.M.E.–D.C.,* 517 F.2d 299, 314–15 (5th Cir.1975), *vacated on other grounds,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1987). Accordingly, the court finds that the EEOC's proof is sufficient to establish a pattern and practice of racial discrimination in violation of Title VII for the years 1979 through 1985.

■ 10. The EEOC failed to establish that O & G engaged in any age discrimination.

## CONCLUSIONS

It is therefore ordered and adjudged that:

1) Defendant O & G is liable for (a) having discriminated against blacks as a class on account of their race in both recruitment and hiring for entry level factory jobs and having engaged in a pattern and practice as such disparate treatment of blacks, and (b) having established and carried out policies and practices of recruitment as to such jobs that had a disparate adverse impact upon blacks and constituted a pattern and practice of discrimination all in violation of Title VII for the years 1979 through 1985.

2) Defendant O & G is not liable for (a) discriminating against those over forty or forty-five as a class on account of their age in either recruitment or hiring for entry level factory jobs, nor is it liable for (b) having established or carried out any policies or practices of recruitment that had a disparate adverse impact upon those over forty-five as a class on account of age which constituted a pattern and prac-

tice of discrimination as prohibited under ADEA.

IT IS SO ORDERED.